**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

|  |  |
|---|---|
| JOHN LERCH, | |
| Plaintiff, | |
| v. | Civil Action No. TDC-18-4014 |
| WCS CONSTRUCTION, LLC and WILLIAM C. SMITH & CO., INC., | |
| Defendants. | |

**MEMORANDUM OPINION**

Plaintiff John Lerch has filed suit against Defendants WCS Construction, LLC ("WCS Construction") and William C. Smith & Co., Inc. ("W.C. Smith") alleging that while employed by WCS Construction, he was subjected to age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621–634 (2018), and discrimination based on family responsibilities in violation of the District of Columbia Human Rights Act ("DCHRA"), D.C. Code §§ 2-1401–2-1411 (LexisNexis 2013).  Presently pending before the Court is Defendants' Motion for Summary Judgment.  Having reviewed the filings, the Court finds that no hearing is necessary.  *See* D. Md. Local R. 105.6.  For the reasons set forth below, the Motion will be DENIED.

**BACKGROUND**

**I.      The Parties**

Lerch worked at WCS Construction from March 1, 2003 until his termination on August 22, 2017.  He was 62 years old at the time of his termination.  Lerch was originally hired by Jim Anglemyer, the President of WCS Construction, to serve as a Project Manager, and he reported to

Anglemyer throughout his career at WCS Construction.  Lerch eventually received promotions to Senior Project Manager and, later, Project Executive.  Lerch served as a Project Executive from July 2007 until his termination.

WCS Construction is a general contractor located in the Washington, D.C. area that primarily constructs multi-family residential buildings for client developers.  W. Christopher Smith, Jr. is the sole owner and member of WCS Construction.  The daily operations of WCS Construction are handled by the President of WCS Construction, who reports to Smith.  Anglemyer was the President of WCS Construction from 2001 until his departure from the company in July 2017.  After Anglemyer left the company, Scott Vossler, who had served as WCS Construction's Vice President reporting to Anglemyer, took over as the new President and has occupied that role ever since.  The President of WCS Construction is responsible for oversight of all construction projects and for making personnel decisions relating to WCS Construction employees.  However, Smith is involved in certain hiring and firing decisions for WCS Construction, as he, along with Brad Fennell, Senior Vice President of W.C. Smith, "approved" and made the "final decision" to initially hire Vossler as Vice President of WCS Construction.  Joint Record ("J.R.") 191, ECF No. 40.

Smith is also the Chairman, Chief Executive Officer, and majority shareholder of W.C. Smith, a real estate development and property management company affiliated with WCS Construction.  W.C. Smith is one of WCS Construction's major development clients.  At any given time, anywhere from one-third to two-thirds of WCS Construction's business comes from W.C. Smith.  WCS Construction and W.C. Smith share administrative services, such as human resources and benefits services.  Smith oversees the overall direction of W.C. Smith as a company.

## II.     Lerch's Employment

As a WCS Construction Project Executive, Lerch was responsible for a broad array of construction project activities, including preparing project proposals; selecting and managing staff; selecting and overseeing subcontractors; managing finance, budgeting, and scheduling matters; and communicating and collaborating with clients on each construction project to ensure timely completion within budget.  During his tenure at WCS Construction, Lerch worked on 14 to 15 construction projects and a handful of other pre-construction projects that did not move forward. Most recently, beginning in 2012, Lerch was the Project Executive assigned to two W.C. Smith development projects known as the Park Chelsea, located at 880 New Jersey Avenue, S.E. in Washington, D.C., and the Agora, located at 800 New Jersey Avenue, S.E., both of which are large residential buildings in the D.C. Capital Riverfront Improvement District and part of a three-building project known as The Collective.  The Park Chelsea project began in 2012 and was completed in 2016.  The Agora project began in 2014 and was completed in 2018.  Lerch was also the Project Executive on a non-W.C. Smith project known as Pike 3400, which began in 2012 and was completed in 2015.

According to Anglemyer, who was Lerch's supervisor for all but the last month of Lerch's employment at WCS Construction, Lerch was a "hard worker," and Anglemyer always had confidence in the quality of his work.  J.R. 166.  In particular, Lerch made "impeccable" construction proposals, as he was able to accurately predict how much a project would cost or how much time it would take to complete.  J.R. 163.  As a result of that assessment and foresight, he built into proposals certain contingencies to create buffers for changes or unforeseen circumstances.  Lerch applied this knowledge to both W.C. Smith projects and non-W.C. Smith projects.  As a reflection of the level of his performance, Lerch received a bonus of $23,045 in

2016 for his work on several projects, including the Park Chelsea.  Lerch also received several merit-based salary increases between 2013 and 2016, a time period during which the Park Chelsea, the Agora, and Pike 3400 were under construction.

### A.    Smith Statements

Nevertheless, during Lerch's employment at WCS Construction, Smith repeatedly told Anglemyer that he should "get rid of John," in reference to Lerch.  J.R. 165.  According to Anglemyer, Smith stated on multiple occasions that Lerch "was missing a step" and that he was "stuck in the old ways," and he suggested that Lerch could not "keep up."  J.R. 165.  Anglemyer understood these comments to be critical of Lerch's age, particularly where Smith also "pushed" Anglemyer to hire younger people.  J.R. 165.

According to Lerch, at one point toward the end of his time at WCS Construction, Smith said that Lerch was "a little decrepit," which, in combinations with Smith's "looks" and "glances" at him when he struggled to get up from a conference table or walk because of back injuries, caused him to believe that Smith was discriminating against him on the basis of his age.  J.R. 78-79.

Around 2016 or 2017, WCS Construction transitioned its employee health insurance arrangement from being part of a large pool to being self-insured.  According to Anglemyer, in this time frame, on at least one occasion, Smith specifically told him that WCS Construction needed to get rid of two employees because the high cost of providing insurance benefits was negatively impacting the profitability of WCS Construction.  Smith identified the two employees as Lerch and Woody Broghtman, both of whom were over the age of 40.  Lerch's wife had been diagnosed with end-stage renal failure in the fourth quarter of 2016.  Broghtman's wife had also been diagnosed with end-stage renal failure and was undergoing costly treatment.  Smith also encouraged Anglemyer to hire younger males for WCS Construction in order to keep insurance

costs low.  Smith, however, has asserted that he believes that Broghtman left WCS Construction before the company's switch to self-insurance.

### B.      Performance Concerns

Smith denies making the statements that Lerch was "stuck in the old ways" and that he could not keep up at work.  According to Vossler, several of Lerch's more recent projects were delayed and over budget, and while he was Vice President of WCS Construction, Vossler heard in meetings about such delays and about issues with the quality of subcontractor work on those projects.  For instance, Pike 3400, completed on October 15, 2015, was completed 548 days late and was substantially over budget.  The Park Chelsea was completed on July 12, 2016, 432 days behind schedule, and created a loss for WCS Construction of $1,899,277.  The Agora was also consistently delayed and was finished on June 1, 2018, 548 days after the originally scheduled completion date.  At various times, Smith expressed concerns about Lerch's performance on these projects.  In January 2016, he wrote in an email to Anglemyer relating to the Park Chelsea that "[t]here is no confidence in [Lerch]."  J.R. 114.  In another instance, Smith wrote to Anglemyer that Lerch was "drowning with his problems" relating to the Park Chelsea and Pike 3400.  J.R. 126.  In a March 2017 email, Smith asked Anglemyer to sit down with Lerch because he did not "seem very responsive" to an email from a W.C. Smith representative.  J.R. 153.

According to Anglemyer, however, the time and budget issues were not necessarily Lerch's fault.  He has asserted that in order to make W.C. Smith development project proposals more appealing, Smith would manipulate the WCS Construction bid proposals for those projects, such as by decreasing the time estimate or eliminating budget contingencies. As a result, when inevitable changes were later required as the project unfolded, it would create the appearance of a

project going over budget or being delayed.   At times, Lerch questioned these manipulations because they affected the integrity of the WCS Construction bids, which upset Smith.

Smith also asserts that Lerch's style was "not compatible" with that of the W.C. Smith development team, that Lerch could "come across as being agitated, upset, argumentative," and that he did not get along well with others, such as Fennell.   J.R. 17-18, 26.   In 2015, for example, Smith sent emails to Anglemyer stating that he needed to make sure Lerch "[kept] his cool," J.R. 121, and warned that a certain conversation "could send [Lerch] over the edge."   J.R. 135.   Also in 2015, Smith got involved with Pike 3400 because he learned that Lerch was not getting along with Tim McDonald, a member of the development client's team.   During that period, Lerch sent several emails to McDonald with pointed language, such as, "While your reliance on the infallibility of your consultants is rather quaint it is indisputably misplaced."   J.R. 122.   In response to an accusation by McDonald that he had made "specious" representations, Lerch responded by stating, "Thank you for your loquacious and meandering narrative but nothing could possibly be further from the truth."   J.R. 129.   Lerch also responded to a McDonald email asking for more staffing for the project by stating, "Stop trying to inject your infamous venom into this situation."   J.R. 139.

According to Vossler, while he was Vice President of WCS Construction, he heard second-hand accounts of Lerch engaging in an adversarial manner with some subcontractors and development clients.   Fennell has asserted that during a W.C. Smith-owned construction project known as the Grand Lodge more than 15 years ago, he observed Lerch acting "unprofessionally" and in a "disrespectful or demeaning" manner, and that he received complaints about similar behavior in later years, including on the Park Chelsea and the Agora projects, during which Lerch

became "easily agitated, argumentative, and abrasive," blamed others, and engaged in "frequent outbursts and bombastic statements" directed towards others.  J.R. 111.

When the Park Chelsea and the Agora projects were completed and it came time to begin the third building in The Collective, Smith told Anglemyer that because Lerch's management style did not work will with W.C. Smith's development team, Lerch should not be involved in the third building and that Anglemyer should find a different project for Lerch.  At one point, Smith told Anglemyer that he did not want Lerch to work on W.C. Smith projects.  Anglemyer, however, attributes this decision to Smith's displeasure that Lerch had questioned Smith's manipulation of time and budget terms in bid proposals for W.C. Smith projects.

### C.    Termination

After Anglemyer left WCS Construction in July 2017 and Vossler took over as President, Lerch asked to meet with Vossler to ascertain the status of his position at WCS Construction. During a meeting on July 21, 2017, Vossler discussed upcoming projects to which Lerch would likely be assigned.  In addition, Lerch notified Vossler that he had family responsibilities that required flexibility in his schedule, specifically caring for his wife, who was at the time undergoing significant medical treatment.  Lerch left the meeting optimistic about his continued employment at WCS Construction.  According to Vossler, however, he told Lerch that his future prospects at WCS Construction were not good because he could no longer assign Lerch to a W.C. Smith project, noting Lerch's "deteriorated relationship" with Smith based on Lerch's past performance on the Park Chelsea and the Agora.  He told Lerch, however, that WCS Construction had listed Lerch on a proposal for a non-W.C. Smith project that was under consideration.  At the time of the discussion, about 40 percent of WCS Construction's projects were for developers other than W.C. Smith.

7

On August 22, 2017, Lerch was called into a meeting with Vossler and Ian Kessler, Vice President of Human Resources at W.C. Smith.   Vossler informed Lerch that he was being terminated from WCS Construction because it "did not have a place" for him.  J.R. 171.  Neither Vossler nor Kessler stated that Lerch was being terminated for poor performance.  At the time of his termination, Lerch had worked under Vossler for less than 30 days.

According to Vossler, he decided to terminate Lerch because Lerch was not successfully performing as a Project Executive, had failed to deliver projects on budget and on time, particularly the Park Chelsea and the Agora, and could not work collaboratively with clients.  Vossler also decided, based in part on negative feedback from Fennell, that Lerch did not meet the criteria to receive a discretionary bonus for his work on the Agora and declined to pay it.   Vossler acknowledges that he consulted with Smith and Kessler on the decision to terminate Lerch but asserts that he made the ultimate decision.   On September 6, 2017, WCS Construction hired Lerch's replacement, Nello Espos, who was approximately 56 years old at that time.

## III.    Procedural History

Lerch filed an administrative complaint of discrimination on the basis of age and family responsibilities with the United States Equal Employment Opportunity Commission and the District of Columbia Office of Human Rights.  Lerch received a Notice of Right to Sue letter on or about October 22, 2018, and on December 31, 2018, Lerch filed a timely Complaint in this Court.

## DISCUSSION

In the Motion for Summary Judgment, Defendants argue that based on the record evidence, Lerch cannot establish a *prima facie* case of age discrimination under the ADEA or discrimination

based on family responsibilities under the DCHRA, and that Lerch cannot establish that their legitimate, non-discriminatory reasons for Lerch's termination were pretextual.

Defendants also argue that Lerch has provided insufficient evidence to support any hostile work environment claims under either the ADEA or DCHRA. In the Complaint, Lerch alleged that Defendants engaged in discrimination by "expressing hostility" toward him and by "condoning an atmosphere of hostility and harassment," but he did not explicitly assert a hostile work environment claim. Compl. ¶¶ 14(c), 15, ECF No. 1. Where Lerch made no formal hostile work environment claim and has failed to respond to Defendants' argument that there is no viable hostile work environment claim, the Court finds that Lerch has abandoned any such hostile work environment claim under the ADEA or DCHRA. *See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009) (holding that a "failure to oppose a basis for summary judgment constitutes waiver of that argument"); *Mentch v. E. Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997) (finding that the plaintiff had abandoned a claim "by failing to address that claim in her opposition to [the defendant's] motion for summary judgment, or to offer clarification in response to [the defendant's] reply brief"). Although Defendants also argue that Lerch's claim of discrimination based on the failure to receive a performance bonus at the time of his termination lacks merit because such failure did not constitute an adverse employment action, the Court reads the reference in the Complaint to the failure to receive a performance bonus as an allegation about damages from the discriminatory termination, not a freestanding, separate cause of action. The Court therefore will not address that issue.

## I.    Legal Standard

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The Court may rely only on facts supported in the record, not simply assertions in the pleadings.  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248.  A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party.  *Id.* at 248–49.

## II.      Age Discrimination

Lerch first asserts that his termination constituted unlawful age discrimination under the ADEA, which provides that it is "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual" over the age of 40 "because of such individual's age."  29 U.S.C. §§ 623(a)(1); 631(a).  An employee who alleges a violation of this provision must prove that age was the "but-for" cause of the challenged employer decision.  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78, (2009); *Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 725 (4th Cir. 2019).  Such causation can be shown either through direct evidence or through circumstantial evidence under the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).  *Gross*, 557 U.S. at 177–78; *Westmoreland*, 924 F.3d at 725.

Under the *McDonnell Douglas* framework, the plaintiff must first establish a *prima facie* case of age discrimination.  *Westmoreland*, 924 F.3d at 725.  Once a *prima facie* case is established, the burden shifts to the defendant to rebut the presumption of discrimination by producing evidence that it acted for a legitimate, non-discriminatory reason.  *Id*.  If the defendant can meet

such a burden, then the burden shifts back to the plaintiff to show that the articulated reasons offered by the employer are not its true reasons, but were a pretext for age discrimination. *Id.* at 726.

### A.    Decisionmaker

The parties agree that the analysis of whether Lerch's termination was the result of age discrimination properly focuses on the intent of the decisionmaker. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 291 (4th Cir. 2004).  They disagree, however, on the identity of the decisionmaker in this case.  Although Defendants argue that Vossler, who has stated that he made the decision to terminate Lerch, was the relevant decisionmaker, Lerch instead points to Smith as the person responsible for his termination.  Notably, Lerch asserts only that Smith, not Vossler, had any actionable discriminatory animus against him.  The Court thus first addresses the question of whether there is sufficient evidence to support a finding that Smith was the decisionmaker.

Lerch does not identify specific evidence establishing that Smith actually made the formal decision to terminate him.  However, even if Vossler were deemed to be the formal decisionmaker, in limited circumstances, discriminatory intent can be imputed to a formal decisionmaker who personally lacks such intent but is influenced by an action of a supervisor or other company official acting with discriminatory intent to a degree that such action is a proximate cause of the decision. *Staub v. Proctor Hosp.*, 562 U.S. 411, 419–20 (2011) (applying this principle to an alleged violation of the Uniformed Services Employment and Reemployment Rights Act); *Simmons v. Sykes Enterprises, Inc.*, 647 F.3d 943, 949 (10th Cir. 2011) (applying *Staub* "to all types of employment discrimination," including the ADEA).  A supervisor cannot merely have "substantial influence on the ultimate decision" or play a "significant" role in the decision; rather, a supervisor's

discriminatory animus may support liability only if the supervisor was, in effect, "principally responsible for, or the actual decisionmaker behind, the action," such as when the formal decisionmaker effectively rubberstamped the supervisor's recommendation. *Hill*, 354 F.3d at 291.

An example of such a scenario arose in *Reeves v. Sanderson Plumbing Production., Inc.*, 530 U.S. 133 (2000), in which the plaintiff alleged that his termination was based on age discrimination and the evidence of discriminatory intent consisted of statements, such as that the plaintiff was "so old" that "he must have come over on the Mayflower," made by Powe Chesnut, the defendant company's director of manufacturing who was not the formal decisionmaker on the termination. *Id.* at 151-52. The Court concluded that the evidence was sufficient to support the conclusion that Chesnut was nevertheless principally responsible for Reeve's discharge because he was married to the company president, who was the formal decisionmaker, and employees feared him because he had exercised "absolute power" within the company for a long period of time. *Id.* at 152. Thus, in reversing the district court's grant of a post-trial motion for judgment as a matter of law, the Court concluded that Chesnut's age-related comments should have been considered. *Id.*; *see Anderson*, 477 U.S. at 250–251 (holding that the standard for granting summary judgment "mirrors" the standard for judgment as a matter of law, such that "the inquiry under each is the same").

Here, despite Vossler's role as the formal decisionmaker, evidence of the company structure and the dynamics between Smith and the President of WCS Construction support a reasonable inference that Smith was principally responsible for Lerch's discharge. Smith is the sole owner of WCS Construction, as well as the Chairman of W.C. Smith, and thus had the type of authority and power referenced in *Reeves*. *See Reeves*, 530 U.S. at 152. Though Smith may not be responsible for WCS Construction's day-to-day operations, he is regularly consulted by the

President of WCS Construction on hiring and firing decisions relating to certain managerial positions and, in fact, was consulted by Vossler on the termination of Lerch.  He has also made certain personnel decisions himself.  According to Anglemyer, when Vossler was initially hired as Vice President, Smith and Fennell made the "final decision."  J.R. 191.  More broadly, Smith had regular interactions with WCS Construction senior managers, and, as reflected in the documentary evidence, frequently offered his views on particular projects and employees, including on Lerch specifically.  Finally, where Smith had expressed to Anglemyer on multiple occasions that Lerch should be terminated, and the decision was made in the first month of Vossler's tenure as President of WCS Construction after consultation with Smith, the Court finds that there is, at a minimum, a genuine issue of material fact on whether Smith was primarily responsible for Lerch's termination.  *See Reeves*, 530 U.S. at 152.  Where a reasonable jury could find that Smith was the actual decisionmaker, the Court may consider the allegedly discriminatory statements of Smith.

### B.    *Prima Facie* Case

To establish a *prima facie* claim for age discrimination based on a wrongful termination, Lerch must present facts demonstrating that:  (1) at the time of his termination, he was at least 40 years old; (2) he was qualified for his job and performing the required duties at a level that met his employer's legitimate expectations; (3) he was nevertheless terminated; and (4) the position remained open or was filled by a substantially younger individual with comparable qualifications. *Westmoreland*, 924 F.3d at 725; *Hill*, 354 F.3d at 285.  At this stage, the burden "is not onerous," and meeting it "in effect creates a presumption that the employer unlawfully discriminated against the employee."  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–54 (1981).

The parties do not dispute the first and third elements.  *See* 29 U.S.C. § 623(a)(1) (prohibiting discharge of employee because of age).  The Court addresses the remaining elements below.

### 1.      Performance Expectations

Defendants argue that Lerch cannot establish that he was meeting his employer's legitimate expectations at the time of discharge because he was not effectively managing the construction projects for which he was responsible.  Vossler has asserted that he terminated Lerch because of his poor performance on his three most recent projects, each of which ended up over budget and completed more than a year late.  Vossler has also claimed that Lerch was terminated because he could not work collaboratively with clients.  Defendants have offered accounts, including from Smith and Fennell, that Lerch was sometimes combative and had a tendency to deflect or blame other parties whenever there was a problem.  They have also submitted various emails reflecting pointed disagreements between Lerch and others, as well as emails by Smith expressing concern over Lerch's conduct and performance.

While Defendants are correct that as to this inquiry, "[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff," *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000), Lerch has also offered evidence from his prior direct supervisor of almost 15 years, including up until only a month before his termination, that he not only met expectations, but in some instances exceeded them with the quality of his work.  *See Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 517 (4th Cir. 2006) (holding that "[a]lthough on summary judgment an employer is free to assert that the job expectation prong has not been met, nothing prohibits the employee from countering this assertion with evidence").  Anglemyer has characterized Lerch's proposal paperwork as "impeccable," J.R. 163, and stated that he "had the

utmost confidence in his job performance," J.R. 165.  Significantly, Anglemyer has provided explanations to counter some of the criticisms about Lerch's project outcomes.  For instance, according to Anglemyer, the delays and cost overruns on Lerch's projects were mainly the result of Smith's manipulation of the terms of WCS Construction bid proposals on W.C. Smith development projects to make them more appealing, such as by eliminating budget contingencies or decreasing time estimates.  As a result of these up-front changes, Anglemyer explained, the projects inevitably required changes and ended up late and over budget.  Finally, Lerch's claim that he was meeting expectations is bolstered by the facts that he was awarded a bonus in 2016, his last full year with WCS Construction, for his performance on several projects, including the Park Chelsea, and he received several merit-based salary increases over the 2015 to 2016 time period, during which the Park Chelsea, the Agora, and Pike 3400 were under construction.  Thus, where the plaintiff's initial burden to establish a *prima facie* case is "not onerous," *Burdine*, 450 U.S. at 253, and the Court must view the evidence in the light most favorable to Lerch, the Court concludes that Lerch has at least created a genuine issue of material fact whether he met the legitimate performance expectations of his employer.  *See Tillery v. Piedmont Airlines, Inc.*, 713 F. App'x 181, 185 (4th Cir. 2017) (finding that a statement by the plaintiff's supervisor only six weeks before his termination that he was a "seasoned and competent" was sufficient meet this prong of a *prima facie* case of age discrimination).  *Cf. Warch*, 435 F.3d at 518 (in considering whether the plaintiff was meeting legitimate expectations, declining to rely on statements that the plaintiff was doing a good job because they came from individuals whose employment ended well before the plaintiff's termination or from third parties never employed by the defendant company).

### 2.  Substantially Younger Replacement

Lerch, who was 62 years old at the time of his termination, was replaced by a new Project Executive, Espos, who was 56 years old when hired.  Because Espos is only six years younger than Lerch, Defendants argue that Lerch was not replaced by a "substantially younger" employee. *Westmoreland*, 924 F.3d at 725.  There is no bright line for what age qualifies as substantially younger.  *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312–13 (1996).  Courts that have considered age differences in this range have held that "in the absence of additional evidence," an age difference of five or six years or less was not significant.  *See, e.g.*, *Cramer v. Intelidata Techs. Corp.*, 168 F.3d 481, 1998 WL 911735, at *3 (4th Cir. Dec. 31, 1998) (finding that without more, a five-year age difference was not "substantially younger"); *Grosjean v. First Energy Corp.*, 349 F.3d 332, 340 (6th Cir. 2003) (holding that, "in the absence of direct evidence that the employer considered age to be significant, an age difference of  six years or less between an employee and a replacement is not significant").  In this case, however, Lerch has offered other evidence that Smith was motivated by age discrimination.  In his affidavit, Anglemyer stated that Smith "was always on me 'to get rid of [Lerch]," and "pushed" him hire younger people. J.R. 165.  Smith also told Anglemyer that Lerch was "missing a step" and "stuck in the old ways." *Id.*  In his deposition, Lerch testified that on one occasion, Smith called him "a little decrepit."  J.R. 78.  Ultimately, this element of the *prima facie* case focuses on whether there is "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion." *O'Connor*, 517 U.S. at 312 (quoting *Teamsters v. United States*, 431 U.S. 324, 358 (1977)).  When this evidence is considered along with the age difference, the Court finds that Lerch has submitted sufficient evidence to satisfy this prong of a *prima facie* case.

### C.    Legitimate, Non-Discriminatory Reason

Where Lerch has met his burden to establish a *prima facie* case of discriminatory discharge, the burden shifts to Defendants to show a legitimate, non-discriminatory reason for the termination decision.  *See Westmoreland*, 924 F.3d at 725; *Hill*, 354 F.3d at 285.  This burden is "only one of production, not persuasion."  *Causey v. Balog*, 162 F.3d 795, 800 (4th Cir. 1998).  Because this step "precedes the credibility-assessment stage," all that is required of the defendant at this point is the introduction of evidence which, if "*taken as true*, would *permit* the conclusion" that there was a non-discriminatory reason "for the adverse action."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993) (discussing the defendant's burden under the *McDonnell Douglas* framework in cases under Title VII of the Civil Rights Act of 1964).

As discussed above, Defendants offer several reasons, related to Lerch's job performance as the Project Executive on several WCS Construction projects, that Lerch was terminated in August 2017.  The criticisms of his work performance fall into two categories.  First, Defendants point to negative outcomes on Lerch's projects.  According to Vossler, one reason he terminated Lerch was because the Park Chelsea, the Agora, and Pike 3400 projects all ended up significantly delayed and over budget.   Second, Defendants cite Lerch's general demeanor towards clients and others when discussing or resolving issues arising during projects.  Among other evidence, Smith asserts that Lerch could "come across as being agitated, upset, argumentative" and did not get along well with others, J.R. 17-18, and Fennell has stated that Lerch engage in "frequent outburst and bombastic statements" toward others, J.R. 111.  Defendants have also submitted various emails exhibiting arguably unprofessional reactions by Lerch, such as emails responding to McDonald in which Lerch described McDonald's messages as "loquacious and meandering" and "inject[ing] your infamous venom" into a situation.  J.R. 129, 139.

17

Where Defendants have produced evidence of concerns about poor outcomes on Lerch's projects and frustrations about Lerch's demeanor and interpersonal interactions at work, the Court finds that the Defendants have identified a legitimate non-discriminatory reason for Lerch's termination. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996) (holding that "[j]ob performance" is "widely recognized as [a] valid, non-discriminatory bas[i]s for any adverse employment decision"); *Collier v. Serv. Am. Corp.,* 934 F. Supp. 168, 170, 172 (D. Md. 1996) (holding that substantial customer dissatisfaction with the plaintiff's performance, along with personality attributes such as being argumentative and defensive in response to criticism, constituted a legitimate, non-discriminatory reason for the termination).

### D.    Pretext

If the defendant makes a showing of a legitimate, non-discriminatory reason for the termination, the burden then shifts back to the plaintiff to show that the stated reason was a "pretext for discrimination." *Hill*, 354 F.3d at 285. Lerch ultimately bears the burden to show by a preponderance of the evidence that the Defendants' explanations are "pretextual or otherwise unworthy of credence." *Henson v. Liggett Grp., Inc.*, 61 F.3d 270, 275 (4th Cir 1995). In resolving this issue, the Court considers "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered" to determine whether judgment as a matter of law is appropriate. *Reeves*, 530 U.S. at 148–49.

To show pretext, Lerch relies primarily on statements made by Smith to Anglemyer. Anglemyer has stated that on multiple occasions, Smith told him that he should "get rid of [Lerch]" and that Lerch was "stuck in the old ways" and "missing a step," which Anglemyer understood to be criticisms of Lerch's age. J.R. 165. Smith also pushed Anglemyer to hire younger people.

Though Smith denies making some of these statements, the Court must draw all reasonable inferences in favor of Lerch at this stage.

Lerch also relies on statements by Smith instructing Anglemyer to get rid of Lerch and another employee, Broghtman, because both had wives who had serious health conditions requiring costly medical treatment at a time when WCS Construction had a healthcare plan that was self-insured.  Since both Lerch and Broghtman were over 40 years old at the time, Lerch argues that Smith's alleged effort to remove them because of the high cost of their health insurance needs demonstrates age discrimination.  Such statements do not necessarily establish age discrimination.  *See Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993).  In *Hazen Paper*, the Court found that an alleged policy to terminate employees who had more than nine years of service in order to remove them before their pensions vested when they reached ten years of service was not "necessarily age based" because even though years of service with a company may be correlated with age, that metric is "analytically distinct" from age and could be considered without regard to age.  *Id.* at 611-12; *see also Cupples v. AmSan, LLC*, 282 F. App'x 205, 210 (4th Cir. 2008) ("An employee's age is analytically distinct from [the employee's] healthcare and payroll costs.").  In this instance, Smith's directive focused on the high healthcare costs generated by Lerch's wife, not the ages of Lerch or his wife.  However, where Smith separately "encouraged" Anglemyer "to hire younger males to keep . . . insurance costs low," J.R. 165, the Court finds that this reference to a specific interest in hiring younger workers is probative on the issue of age discrimination, because it is undoubtedly based on a "generalization about age" and a "prohibited stereotype" that "[o]lder employees are likely to be" a certain way, in this case likely to generate higher healthcare costs.  *Hazen Paper Co.*, 507 U.S. at 611–12 (distinguishing a policy to terminate

individuals solely based on years of service, without regard to age, to prevent their pensions from vesting, from a policy based on a "stereotype" based on how "[o]lder employees are likely to be").

Beyond Smith's statements referencing Lerch's age and an interest in hiring younger workers, the circumstances of Lerch's termination raise the specter of pretext. According to Lerch, when he met with Vossler within one month before his termination, Vossler discussed potential projects on which Lerch could work on in the upcoming months, and even stated that he had submitted Lerch's name with a project bid, yet Lerch was then abruptly terminated without explanation, within the first 30 days of Vossler's tenure as President of WCS Construction. Although Vossler has stated that he told Lerch that he could no longer work on W.C. Smith projects, approximately 40 percent of WCS Construction's business at the time of Lerch's discharge consisted of non-W.C. Smith projects. Finally, when Lerch was terminated, no mention was made of the reasons now offered by Defendants, such as his alleged poor performance on certain projects and his purportedly disagreeable personality.

Although Defendants submit significant evidence to dispute Lerch's facts, at this stage, where the Court must view the evidence in the light most favorable to Lerch, the Court concludes that when the evidence is considered together, there is a genuine issue of material fact whether, but for Smith's discriminatory animus based on age, Lerch still would have been terminated. *See Schafer v. Md. Dep't of Health & Mental Hygiene*, 359 F. App'x 385, 389 (4th Cir. 2009) (denying a motion for summary judgment when the court concluded that a jury could find that another company official, who had used an improper criterion as the basis of an employment decision, was the actual decisionmaker). The Court will therefore deny Defendants' Motion as to the age discrimination claim.

III.    **D.C. Human Rights Act**

Defendants separately seek summary judgment on Lerch's DCHRA claim.  The DCHRA protects an employee from a discriminatory discharge that is "wholly or partially for a discriminatory reason based upon the actual or perceived" membership in a protected class under the statute, which includes "family responsibilities."  *See* D.C. Code § 2–1402.11(a)(1)(A).  The DCHRA defines "family responsibilities" as "the state of being, or the potential to become, a contributor to the support of a person or persons in a dependent relationship, irrespective of their number, including the state of being the subject of an order of withholding or similar proceedings for the purpose of paying child support or a debt related to child support."  D.C. Code § 2-1401.02(12).

DCHRA discrimination claims are "assessed pursuant to the three-step framework set forth in *McDonnell Douglas*."  *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 576 (D.C. Cir. 2010).  To establish a *prima facie* case of discriminatory discharge under the DCHRA, a plaintiff must show that:  (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position that was the subject of the termination; (3) the plaintiff was terminated despite being qualified for the position; and (4) a substantial factor for the termination was that the plaintiff is a member of the protected class.  *Wallace v. Eckert, Seamans, Cherin & Mellott, LLC*, 57 A.3d 943, 955–56 (D.C. 2012); *Siddique v. Macy's*, 923 F. Supp. 2d 97, 103 (D.D.C. 2013).  Once a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to rebut the presumption of unlawful discrimination by articulating a legitimate, non-discriminatory reason for the employee's termination.  *Wallace*, 57 A.3d at 956.  If the defendant does so, the question on summary judgment is whether the employee has produced sufficient evidence for a reasonable jury to find that the employer's asserted reason was pretextual and was not the actual reason, and that the employer

21

intentionally discriminate against the employee on the basis of a protected class.  *See Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1246 (D.C. Cir. 2011); *Wallace*, 57 A.3d at 956.

### A.    *Prima Facie* Case

On the first prong, whether Lerch is a member of a protected class, Defendants argue that Lerch is not covered by the DCHRA because there is no authority extending "family responsibilities" as a protected class to individuals such as Lerch, whose employment was the basis for the company's health insurance providing coverage for his wife's medical expenses, and who was personally expending significant time caring for his wife.  Based on the plain language of the term "family responsibilities" under the DCHRA, the Court finds the Lerch is covered because he is "a contributor to the support of a person . . . in a dependent relationship."  D.C. Code § 2-1401.02(12).  Lerch's wife had been a Type 1 diabetic since she was 11 years old, and she had several medical conditions, including being legally blind since 1984, having end-stage renal failure, and having neuropathies and other neurological complications that come with that disease.  As a result of these medical complications, Lerch became his wife's caretaker as early as 1984 when her eyes hemorrhaged and she could no longer drive.  Lerch's care of his wife also included taking her to see physicians or go to laboratories for tests, and as a result, Lerch sometimes had to take time off or adjust his work schedule to attend to these personal responsibilities.  In addition to Lerch's responsibility to contribute to the care of his wife by taking the time to assist her, he also contributed to her support financially as the source of income to pay medical bills or to secure the benefit of the company's health insurance to do so.  Since the DCHRA includes within the definition of family responsibilities certain financial obligations, such as child support requirements, Lerch's financial support of his wife also illustrates that he had family responsibilities that placed him within the meaning of the statute.  Where "the DCHRA is a

remedial civil rights statute that must be generously construed," *Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 731 (D.C. 2000), the Court finds that Lerch's care of his wife placed him within the DCHRA protected class of individuals with family responsibilities.

As the Court has already addressed, Lerch has presented sufficient information to support a finding that he was qualified for the position from which he was terminated. *See supra* part II.B.1. Thus, the only remaining prong Lerch must demonstrate is that his family responsibilities was a substantial factor in his termination. Anglemyer has testified that Smith told him he needed to "get rid of" Lerch and another employee because they both had wives with end-stage renal failure and were undergoing costly treatment that was affecting WCS Construction's profitability. J.R. 165. Although the timing of the statement relating to Broghtman may be in dispute, the statement relating to Lerch plainly singled him out as an employee who had unique family responsibilities to care for his spouse and thus "creates a presumption that the employer unlawfully discriminated against the employee." *Cf. Burdine*, 450 U.S. at 254. Further, because the evidence supports a finding that Smith was the actual decisionmaker for Lerch's termination and was aware of the healthcare costs for Lerch's wife, Vossler's claim that he lacked knowledge of those health insurance costs, does not alter this conclusion. To the extent that Vossler could be found to be the actual decisionmaker, the fact that he terminated Lerch shortly after the meeting at which Lerch disclosed his need to have flexibility in his work schedule to meet his obligations to care for his wife itself satisfies this causation prong of the *prima facie* case. Thus, there is sufficient evidence to support a *prima facie* case of discrimination based on family responsibilities.

### B.    Legitimate, Non-Discriminatory Reason

As to a legitimate, non-discriminatory reason for Lerch's termination, Defendants offer the same explanation offered in relation to age discrimination:  that he performed poorly, delivered

several construction projects over budget and late, and did not communicate effectively with clients.  *See supra* part II.C.  Because, at this stage of the burden-shifting framework, the Defendants' burden is "only one of production, not persuasion," *Causey*, 162 F.3d at 800, the Court finds that they have sufficiently met this requirement.  *See Evans*, 80 F.3d at 960; *Collier*, 934 F. Supp. at 172.

### C.    Pretext

The final step in the analysis is to assess whether the evidence supports a finding that the proffered non-discriminatory reason for Lerch's termination is pretextual, and that a substantial factor for Lerch's discharge was his responsibilities to his ill wife.  The evidence of discriminatory intent discussed in relation to the *prima facie* case is equally applicable here.  Notably, Smith's statements about Lerch and Broghtman were not general expressions of concern about healthcare costs or the impact of family responsibilities on the employees' work.  Instead, Smith discussed these family responsibilities specifically in the context of "get[ting] rid of" these employees.  J.R. 165.  Where Lerch has provided direct evidence of a discriminatory intent to terminate Lerch based on family responsibilities, the Court finds that a reasonable jury could conclude that the stated reasons for terminating Lerch were pretextual and that, at a minimum, his family responsibilities were a substantial factor in his termination. *See Vatel*, 627 F.3d at 1246 (holding that on a DCHRA claim, the question at the summary judgment stage is whether the plaintiff has produced sufficient evidence for a reasonable jury to find that the employer's asserted reason was pretextual and that the employer in fact intentionally discriminated against the employee).  The Court will therefore deny the Motion as to the DCHRA claim.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment will be DENIED.

A separate Order shall issue.

Date:  September 25, 2020                    /s/ *Theodore D. Chuang*
                                                        THEODORE D. CHUANG
                                                        United States District Judge